AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Information associated with the cellular devise assigned call number 614-653-1578, that is stored at premises controlled by Verizon

Case No. 2:24-mj-54

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the  Southern  District of  New York , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2114 | Assault and/or robbery of a postal employee |

The application is based on these facts:
See attached affidavit in support, incorporated here by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Tyler Schwab FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 31, 2024

City and state: Columbus, Ohio

Kimberly A. Jolson
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVISE ASSIGNGED CALL NUMBER (614) 653-1578 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON | Case No. 2:24-mj-54 <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Tyler Schwab, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (614) 653-1578 ("the SUBJECT PHONE") that is stored at premises controlled by Verizon, a wireless telephone service provider headquartered in New York, New York. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 6, 2019. I have been assigned to the FBI Safe Streets Task Force in Columbus, Ohio, since January of 2023. Prior to being assigned to the Safe Streets Task Force, I was assigned to the Joint Terrorism Task Force (JTTF) for approximately four years. During my assignment at the JTTF, I was a Case Agent and Co-Case Agent for multiple international and domestic terrorism

investigations. While assigned to the JTTF, I received specialized training in international terrorism and homicide investigations. Furthermore, I have received training in computer-related crimes as well as in the criminal use of email, social media, and telephonic communications. As a Special Agent with the FBI, I am empowered to enforce the criminal laws of the United States.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## BACKROUND ON RECENT POSTAL ROBBERIES AND MAIL THEFT

4. Federal law prohibits people from assaulting United States Postal Service (USPS) letter carriers with the intent to rob them of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier. 18 U.S.C. § 2114(a). The same statute prohibits people from robbing or attempting to rob those letter carriers of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier. *Id.*

5. When someone commits such an assault or robbery and puts in jeopardy the life of the individual having custody of such mail, money, or other property of the United States by the use of a dangerous weapon, that person commits an "aggravated" assault or robbery under 18 U.S.C. § 2114(a), which qualifies as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A). *Knight v. United States*, 936 F.3d 495, 501 (6th Cir. 2019). As such, when someone uses or carries

2

a firearm during and in relation to an aggravated assault or robbery under § 2114(a), they have also violated 18 U.S.C. § 924(c)(1)(A). *Knight*, 936 F.3d at 497, 501

6. Federal law also prohibits people from stealing any key to any lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter. 18 U.S.C. § 1704.

7. Finally, federal law prohibits people from stealing or attempting to steal any mail matter from or out of any mail receptacle or from any letter carrier. 18 U.S.C. § 1708. The same statute prohibits people from buying, receiving, concealing, or unlawfully possessing any mail matter that has been so stolen if the person has knowledge that the item was so stolen. *Id.*

8. The United States, including the United States Postal Inspection Service (USPIS) and the FBI, has been conducting a criminal investigation into violations of 18 U.S.C. §§ 2114(a), 924(c), 1704, and 1708 committed in and around Central Ohio. The current investigation involves a pattern of violent, armed robberies wherein the suspect(s) hold USPS letter carriers at gunpoint and then force them to hand over their USPS "arrow keys" or "modified arrow keys." USPS letter carriers carry arrow keys and modified arrow keys when they deliver the mail. These keys allow letter carriers to gain entry to secured mail receptacles ("blue boxes") and secured cluster mailboxes found at apartment and condominium complexes. As of the writing of this affidavit, approximately thirty robberies have occurred from January 5, 2022, to December 7, 2023, throughout the Columbus, Ohio area that have been identified as part of this pattern.

9. Once the suspect(s) obtain the stolen keys, those suspect(s) then use those keys to open secure mail receptacles and cluster boxes to steal mail matter. This process of stealing the mail is sometimes referred to as "fishing." The stolen mail matter includes, among other valuable items, personal checks, business checks, and other negotiable financial instruments. The suspect(s) then wash these checks and/or reproduce them through fraudulent means before

3

subsequently cashing and/or depositing them at ATMs and other locations. This process of washing and/or reproducing the checks is sometimes referred to as "cooking."

10. Because a stolen USPS key can be utilized to "fish," "cook," and subsequently profit from, the stolen keys retain intrinsic value in and of themselves. I have learned that suspect(s) who rob letter carriers of their keys will sometimes sell those keys to third parties or "rent" them out to third parties for a discrete period without ever fishing or cooking themselves.

11. I know, based on my knowledge, training, and experience, that individuals who are involved in the criminal activity described above often use cell phones to coordinate the initial assaults and/or robberies of the letter carriers and to facilitate the fishing, cooking, and financial crimes previously described.

12. More specifically, I know that individuals involved in the criminal activity described above use cell phones to coordinate meetups with co-conspirators and others involved in the planning and execution of the initial postal assaults and/or postal robberies—including to procure firearms for use during those assaults and/or robberies. Those individuals also use cell phones for navigation purposes both to and from the site of an assault and/or robbery. Likewise, those individuals use cell phones to take photographs and videos of themselves in possession of stolen USPS keys and/or stolen mail matter. Those same individuals also use cell phones to coordinate the sale and/or rental of USPS keys to third parties. Finally, those individuals use cell phones to coordinate the fishing, cooking, and negotiation of stolen or fraudulent financial instruments. This use of cell phones involves calls, texts, social media applications, navigation tools, and a host of other available applications.

13. I also know from my training and experience that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to

4

participation in modern society." *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

## PROBABLE CAUSE

14. I submit there is probable cause to believe that a violation of 18 U.S.C. § 2114(a) [Aggravated Assault/Robbery of Postal Employees] has been committed by Isaac Thompson (THOMPSON), also known as "ISO," and other individuals both known and unknown. There is also probable cause to search the information described in Attachment A for evidence of this crime as further described in Attachment B.

### Armed Robbery-January 17, 2023, 400 South 5th Street, Columbus, Ohio

15. On January 17, 2023, at approximately 3:10 p.m., Postal Inspectors responded to 400 South 5th Street in reference to a robbery of a postal worker.

16. Upon arrival, Inspectors spoke with postal worker victim D.S. (a person over 18 years old) who advised the following:

17. While collecting mail from the collection boxes located at the corner of East Engler and South 5th Street, D.S. was approached from behind by Suspect 1. Suspect 1 tried to take D.S.'S postal keys, which were in the collection box lock, out of the lock. Suspect 1 then said, "I need those, I need those." D.S. then asked Suspect 1 what he was talking about. Suspect 1 then pulled a handgun out. D.S. then removed the keys from his belt and Suspect 1 fled with the keys. Suspect 1 got into a vehicle that D.S. described as a silver compact four door sedan with dark tint on the windows. The vehicle was being driven by Suspect 2.

18. On August 18, 2023, and September 8, 2023, Postal Inspectors and other law-enforcement agents, including your affiant, met with a cooperating informant who was involved in, participated in, helped plan, and had knowledge of multiple armed postal robberies and attempted postal robberies committed in the Columbus, Ohio area and elsewhere. That informant

5

("CI #1") admitted to his own role in roughly a dozen postal robberies – either as a planner, facilitator, or participant – and shared information regarding the spate of other recent postal robberies, mail theft, and related financial crimes described throughout this affidavit. CI #1 is currently facing federal charges for his role in several of these robberies. CI #1 met with investigators in the hope of receiving more favorable consideration in his current case, but no promises were made to him regarding the nature or extent of any charging and/or sentencing leniency. To date, the information that CI #1 provided has proved truthful and reliable through corroboration from other human sources, law-enforcement reports, cell-site location data and GPS location data, and other electronic evidence obtained during this investigation.

19. CI #1, who was involved in, participated in, helped plan, had knowledge of, and witnessed the postal robbery that THOMPSON was involved in, provided the following information regarding the armed robbery on January 17, 2023:

20. The postal robbery that occurred on January 17, 2023, was committed by THOMPSON, Kenan Lay, who is currently facing federal charges and has plead guilty for his role in another postal robbery, and Jeremiah Thompson, also known as JT. January 17, 2023, started off with JT calling CI #1 and asking CI #1 to drive THOMPSON and Lay to a location where they were to pick up a vehicle, they were to use to commit the postal robbery. CI #1 ended up driving THOMPSON and Lay to the Brookeville neighborhood, which is located in the area of the Brookeville Apartments, 6851 Sharon Court, Columbus, Ohio, to pick up the vehicle. The vehicle THOMPSON and Lay were picking up and going to use for the postal robbery, was a silver Kia sedan that was stolen prior to January 17, 2023, by an unknown individual/individuals.

21. CI #1 confirmed the vehicle in the below photo that was taken from security camera footage from January 17, 2023, from Columbus Downtown High School, which is located

6

approximately one block from the location of the postal robbery, was the stolen silver Kia sedan that was used in January 17, 2023, postal robbery:



22. When CI #1, THOMPSON, and Lay got to the stolen silver Kia sedan, the battery was dead and it would not start. They had to find someone to jump the Kia for them. They eventually got the vehicle started and THOMPSON and Lay drove it to a McDonald's. CI #1 drove directly behind THOMPSON and Lay in his own vehicle and met THOMPSON and Lay at McDonald's. When they got to the McDonald's, JT was already there and provided THOMPSON and Lay with the location of where the postal worker would be located.

23. CI #1 then left the McDonald's but was still in the area when he spotted a postal worker. CI #1 then called JT and told him of the postal worker's location. JT then called Lay and told him where to go. Lay then pulled up to where the postal worker was delivering mail in the stolen silver Kia sedan and THOMPSON got out of the vehicle. THOMPSON approached the postal worker and initially tried to pull the postal worker's keys, which were still in the open mailbox, out of the box. When the keys did not come out of the mailbox, THOMPSON lifted his

7

shirt and showed the postal worker his gun. THOMPSON then shut the mailbox and pulled the postal keys out of the mailbox.

24. The gun that THOMPSON used in the robbery was provided to him by JT. JT gave the gun to THOMPSON before the robbery when everyone met at the McDonald's.

25. Following the robbery, Lay and THOMPSON ditched the stolen silver Kia in an area that JT told them to. CI #1 then picked up THOMPSON and Lay and drove THOMPSON to his residence, which was located in the Reynoldsburg area. After dropping off THOMPSON, CI #1 and Lay eventually met JT at Walmart on South High Street. While they were at the Walmart, CI #1, JT, and Lay did the money exchange for this robbery. JT paid CI #1. Once CI #1 got the money from JT, CI #1 then paid Lay approximately $1,500 in cash. Lay then gave the postal key from the robbery to JT. After the money exchange was complete, CI #1 then drove Lay to his residence, which was located in the area of Driving Park.

26. CI # was shown the following photo:



27. According to CI #1, the keys in the photo that are on the ring, are the postal keys that were from the robbery that occurred on January 17, 2023. JT texted CI #1 this photo because another individual wanted to purchase the postal keys from the January 17, 2023, robbery. The

8

other gold postal key in the photo was a postal key that JT purchased from someone in Chicago, which did not work in the Columbus area mailboxes.

28. Additionally, at the time of this robbery, CI #1 was under court-ordered electronic monitoring while out on bond in an unrelated criminal case. As a result, CI #1 was wearing an ankle monitor that recorded his locations. CI #1's ankle monitor corroborates what he told investigators as his ankle monitor recorded CI #1's locations on January 17, 2023, at the following times:

- CI #1 was at 1692 East Kossuth Avenue (Lay's residence), at approximately 12:07 p.m. (picking up Lay prior to the robbery).
- CI #1 was in the Brookville neighborhood from approximately 1:23 p.m. to 1:36 p.m. (CI #1 dropping off THOMPSON and Lay at the stolen Kia sedan prior to the robbery and trying to get the vehicle jump started).
- CI #1 was at the McDonald's located at 381 East Main Street from approximately 3:04 p.m. to 3:08 p.m. (meeting location with JT).
- CI #1 was in the area of 400 South 5th Avenue (robbery location site) at approximately 3:11 p.m. (contemporaneous with the robbery).
- CI #1 was in the area of 7300 Brooke Blvd., Reynoldsburg, Ohio (THOMPSON'S residence) at approximately 4:32 p.m. (dropping off THOMPSON).
- CI #1 was at the Walmart located at 3579 South High Street from approximately 5:54 p.m. to 6:33 p.m. (meeting location where CI #1 and JT paid Lay for the postal keys).
- CI #1 was at 1692 East Kossuth Avenue (Lay'S residence) at approximately 6:52 p.m. (dropping Lay off after the robbery).

9

29. Additionally, a search warrant was signed by United States Magistrate Judge Elizabeth Preston Deavers on May 15, 2023, and was executed on May 18, 2023. This search warrant was for CI #1's residence and included electronic devices found in the residence during the search. During the execution of the search warrant, a phone belonging to CI #1 was found. A review of this phone found text messages between CI #1 and multiple other individuals that corroborate THOMPSON'S involvement in the January 17, 2023, postal robbery. The following text communication occurred between CI #1 and Lay on January 17, 2023:

> Lay: you coming?
>
> CI #1: Yop my girl getting iso
>
> CI #1: Yu gotta blicc?
>
> Lay: fasho
>
> CI #1: Yu let iso use dat?
>
> Lay: yea fasho
>
> Lay: when we get there
>
> Lay: an about to do everything and shi

30. Through my knowledge, training, and experience in this investigation and others, I know that when CI #1 wrote, "Yu gotta blicc?" and "Yu let iso use dat?" he was asking Lay if Lay had a firearm and if THOMPSON could use it. The term blicc is slang for gun. Also, when CI #1 wrote, "Yop my girl getting iso," he meant that his girlfriend was picking up THOMPSON.

31. CI #1 also had the following text conversation with an individual that goes by the name "AJ" on January 17, 2023:

> CI #1: Gang why ain't dis hoe turnin on was it workin for Yu?

10

> CI #1: I needa new one bro I'm fin try jumpin it I think it cuz niggas was drivin a lot
>
> AJ: Fuck around long distances n shi

32. Taking the above conversation and putting it into the context of what investigators were told by CI #1, when CI #1 texted "Gang why ain't dis hoe turnin on was it workin for Yu?" CI #1 is referencing the stolen silver Kia sedan that would not start. Additionally, CI #1 sent the "Gang why ain't dis hoe turnin on was it workin for Yu?" text at approximately 1:33 p.m. on January 17, 2023. This is the time in which CI #1's GPS ankle monitor shows that he was located in the Brookeville Neighborhood, where CI #1 told agents the stolen silver Kia sedan was initially located.

## IDENTIFICATION OF PHONE

33. According to Verizon, the subscriber of phone number (614) 653-1578 was Tamara Thompson from July 17, 2019, to January 3, 2024. Tamara Thompson's listed address, according to Verizon, was 3548 Blackwell Blvd., Murfreesboro, Tennessee. Tamara Thompson is believed to be a family member of ISAAC THOMPSON.

34. Additionally, according to AT&T the current subscriber of phone number (614) 653-1578 is ISAAC THOMPSON. ISAAC THOMPSON has been the subscriber since December 19, 2023. ISAAC THOMPSON'S address, according to AT&T, is also the same address that Verizon listed as Tamara Thompson's address, 3548 Blackwell Blvd., Murfreesboro, Tennessee.

35. In my training and experience, I know that families often share a family cell phone plan as a way to reduce the cost of their plans. Oftentimes, a parent/guardian will be the registered subscriber of a family cell phone plan, but their child will use the phone number. As the dependent minor gets older and becomes more established, that individual will often get their own cell phone plan and become the registered subscriber of that number. In this case it appears that Isaac

11

Thompson was on a family plan with Tamara Thompson until December 2023 and then left Verizon and got his own cell phone plan with AT&T.

36. In my knowledge and experience, I also know that individuals will switch their cell phone carriers to try and get a better deal on their cell phone plan or to get a new phone. Often when they do switch cell phone carriers, they will keep their phone number. This also appears to be the case with Isaac Thompson as he switched cell phone carriers from Verizon to AT&T in December of 2023, and kept his (614) 653-1578 phone number.

37. Also, a search of CI #1's phone that was found during the search of their residence found that CI #1 had "ISO's" cell phone number listed as (614) 653-1578. Cell phone number (614) 653-1578 was entered into CI #1's cell phone sometime between June 30, 2022, and May 17, 2023. During the interview of CI #1 on September 8, 2023, CI #1 identified a photo of ISAAC THOMPSON and confirmed he went by the nickname "Iso."

38. In my training and experience, I have learned that Verizon is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is

12

typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

39. Based on my training and experience, I also know that Verizon can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

40. Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONES' user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

41. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

42. I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon, who will then compile the requested

records at a time convenient to that carrier, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

43. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

_____
Tyler Schwab
Special Agent
FBI

Subscribed and sworn to before me on _____January 31, 2024_____, 2024

_____
Kimberly A. Jolson
United States Magistrate Judge

14

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (614) 653-1578 ("the Account") that are stored at premises controlled by Verizon ("the Provider"), headquartered in New York, New York.

## ATTACHMENT B

### Particular Things to be Seized

I.  **Information to Be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period between January 15, 2023, and January 19, 2023.

    a.    The following information about the customers or subscribers of the Account:

        i.    Names (including subscriber names, user names, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.    Local and long distance telephone connection records;

        iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

        vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.    the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers [call detail records]), email addresses, and IP addresses); and

        ii.    information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C § 2114 (assaulting or robbing any person who has lawful charge, control, or custody of any mail matter or of any money or other property of the United States), for the time period of January 15, 2023, through January 19, 2023, for the Account listed in Attachment A.